JUNE TERM 1836.

Russell
v.
Geyer and others.

———◦※◦———

### RUSSELL v. GEYER AND OTHERS.

1. A judgment by confession before a clk. of the cir. court, is legal and the statute which authorises such judg'ts. is constitutional.
2. The circuit ct. cannot make such judgments, its judgments, and thereby alter the time when their lien would commence.
3. Where an attorney directs an execution to issue, contrary to the instructions of his client, and the sheriff sells property under the execution, it is not necessary, in order to affect the purchasor at the sheriff's sale, to prove him informed of the fraud of the atty.
4. The atty. for pltfs. in execution, purchases the property at sheriff's sale, professing at the time to act as agent for his clients, and with a view to the payment of their execs.—he holds the property for 6 or 8 months, to give the def. in execution time to pay off the execu's. and with a promise in that event, to reconvey to def.—finally the def. failing to make any tender, he sells the property at public auction, to satisfy the demands of his clients.
   Held, that there being no evidence of fraud, on the part of the atty. arising from gross inadequacy of price or otherwise, either at the sheriff's sale or the sale at auction, he is not to be considered as a trustee for the benefit of the def's. creditors, and the purchasor takes a good legal and equitable title.
5. Atty, for plaintiffs in execution, purchased at sheriff's sale, and after some months sold to A. in order to raise the money due his clients. A. gave his bond to def. in execution, to convey the property to him, in consideration of certain sums paid down and other sums to be paid at specified times, conditioned to be void in case of a failure to pay at the time;—def. failing to raise the money, applied to B. who advanced it for him, and took a conveyance to himself, and gave a similar bond to def.—Again failing to raise the necessary sums, to entitle himself to a conveyance, the def. applied to C. and at his request, B. conveys to C. who gives def. a written promise, that on the payment of a specified sum on a day fixed, he would convey to him. —Held, after the lapse of the *time* fixed on, the def has no claim in equity for a specific performance of the contract, and consequently, his creditors have none.

On the 13th July 1827, Russell filed his bill against the four first defendants; and at the next November term of the circuit court, he filed an amended bill, making Lindell

Statement of the case.

49

a party; before hearing, the bill was dismissed as to Collier—after hearing, the bill of the complainant was dismissed, and to reverse the decree of the circuit court, the complainant comes into this court.

The bill charges that Geyer being seized in fee of two lots of ground, situated in the city of St. Louis, and being indebted to one Rufus Easton, in the sum of two thousand, six hundred and sixty-one dollars and ninety-nine cents, upon three several promissory notes; made to said Easton a mortgage deed for the said lots of ground, on the 27th day of September, A. D. 1821, to secure to said Easton the payment of the principal sum of money due on said notes, as well as the interest; and that on the 4th day of January 1825, Easton in consideration of the sum of eleven hundred and ten dollars, transferred to the complainant all his interest in said mortgage and notes. On the 10th June 1822, the said lots were sold to said Wash at sheriff's sale, for the sum of one hundred and ten dollars and fifty cents. At the time the lot was sold to Wash there were executions in the hands of the sheriff issued on seven judgments, each of which had been levied on the property sold: 1st, Bryan and Bryan v. Henry S. Geyer, confessed in vacation before the clerk, on the 3rd January 1821, for $755, 78; and on 13th March 1822, ordered by the court to be entered as a judgment of the court of the April term 1821. 2nd, Dent v. Geyer, confessed in vacation, 3rd January 1821, for $420, ordered by the court on 13th March 1822, to be entered as a judgment of the court, of the April term of the year 1821. 3rd, Turner v. Geyer, confessed in vacation, 6th March 1821, for $1266, 94, ordered by the court, on the 18th October 1821, to be entered as a judgment of the term of April, for the year 1821. 4th, Carr v. Geyer, rendered 4th Sept. 1821, for $176, 37. 5th, Chenier v. Geyer, 18th Sept. 1821, for $477, 65. 6th, Jamison v. Geyer, rendered 16th October 1821, for $116, 25. 7th, Foster v. Geyer, rendered 6th Feb. 1822, for $171, 67¼.

Geyer's mortgage deed to Easton, executed as above stated, on 27th September 1821, was recorded on 14th November 1821. The bill charges, that at the time of the sale of the lots by the sheriff to Wash, they were worth nine thousand dollars. On the 31st March 1823, Wash for the consideration of $1500, sold to Ferguson, one of the defendants, the same lots. The bill further charges, that Wash purchasing the said property, acted as the agent of the said Ferguson, who owned or pretended to own said judgment and execution of said Turner

against said Geyer; and also as agent or trustee of said Geyer; and that as agent or trustee of said Geyer and Ferguson, Wash conveyed the said property to said Ferguson; and that it was agreed between said Geyer and Ferguson, before the sale took place, that said Wash should purchase said property for their benefit, and that when Wash purchased the said property and when he conveyed it to Ferguson, it was agreed between Geyer and Ferguson, that if Geyer should pay to Ferguson the sum of fifteen hundred dollars within a certain time thereafter, the property should belong absolutely ro Geyer.

On the 31st day of March 1823, being the same day that Wash conveyed the property to Ferguson; he (Ferguson) made to Geyer a deed of defeasance, stating that whereas Ferguson had that day, sold and agreed to convey to said Geyer, the property above mentioned; in consideration whereof, Geyer had paid to him the sum of nine hundred dollars; and had agreed to pay him the further sum of three thousand, six hundred dollars at several times as mentioned in his deed; therefore Ferguson did agree with Geyer, that so soon as the said sum of money should be paid as was mentioned in the deed, he, Ferguson, would convey the said property to Geyer. The bill charges, that the sale of the property under execution, was fraudulently contrived by Wash and Geyer, to prevent the creditors of Geyer from collecting what he owed them. That Carr having received from another source, a part of what Geyer owed him, ordered his execution to be returned; and that Chenier denied he had given any authority, to issue his execution. On 28th November 1826, Russell obtained against Geyer a judgment in the circuit court for the amount due on the notes made by him to Easton, and assigned by Easton to Russell, as above mentioned. The bill also alleges, that Geyer is greatly embarrassed and has no visible property on which the money due the complainant can be made, except the property above mentioned. That Wash on 20th April 1825, conveyed said property to one George Collier, in furtherance of the intention originally manifested by Ferguson to protect the said property from Geyer's creditors, for the sum of four thousand five hundred dollars; and that Collier as the complainant, was informed and believed, made to Geyer a deed, by which he agreed, in consideration that Geyer would pay to him, at certain times therein mentioned, the said sum of four thousand, five hundred dollars; and for other considerations, that he, Collier, would convey the said property to some per-

son for the benefit of the wife of Geyer; that the deed from Wash to Collier, was made with the assent and privity of Geyer, in order to embarrass the title to the property, and prevent the creditors of Geyer from ascertaining the true situation of the title.

Wash in his answer, states that he was attorney for the Bryans and for Dent, and obtained for them the judgments as stated in the bill,—admits that he purchased the property sold on execution, for the sum of money in the bill mentioned; that he purchased it as agent for his said clients, and not as agent for Ferguson or for any other person than his said clients—admits that on the day of sale, he did say that unless persons interested in preventing a sacriffice of the property would satisfy the executions of which he had the control, as attorney as aforesaid, the law must take its course, he having no discretionary powers. That he frequently remarked to the persons standing around at the time of sale, and making enquiries about the property, that he had no wish or intention to purchase the property, but that he meant to bid for it, and buy it for his clients, or make it bring money enough to pay what was due to them; and that in the event of his being compelled to buy it he would gladly receive the amount of his clients' judgments in some short time, say fifty or sixty days, and would thereupon reconvey to Geyer, or any other person he might name, in trust for the benefit of the other creditors. No agreement however, was entered into either with Geyer or any other person; and he does not recollect ever having conversed or communicated with Ferguson, upon the subject before the sheriff's sale. He states, that instead of waiting fifty or sixty days, as he had promised, he waited six or eight months on Geyer for the amount of Bryans' and Dent's judgment to be paid to him, and being informed by Geyer, that he had made repeated efforts to raise the money, without success, the respondent determined to sell it, in order to raise the sums to be remitted to his clients and accordingly did sell, after having advertised it for fifteen or twenty days; that it was sold at the auction room of Wm. H. Savage, in St. Louis, and that Ferguson became the purchaser, for the sum of fifteen hundred dollars; that the sale to Ferguson was absolute, but that afterwards, finding that Ferguson was not very well pleased with his purchase, he became interested in the purchase of one half thereof. After Wash had been admitted to an interest in the purchase, Ferguson informed him that Geyer had made proposals to purchase the

property from him, upon such terms as are set forth in the deed made by Ferguson to Geyer, which is made an exhibit in this bill. Wash conveyed to Ferguson—Geyer being unable to redeem the land according to contract, with the assent of Wash and Ferguson, effected a sale of the property to George Collier, who paid to Wash and Ferguson, what was due them from Geyer, and Wash then made a deed to Collier for the said property, at the instance and request of Geyer. At the time the respondent made the deed to Collier, it was his belief that the legal title yet remained in him. When the deed from the respondent to Ferguson was executed, the contract with Geyer for the repurchase of his property had just been concluded, and it was the understanding of the respondent, that the said deed was not to be put on record until it should be seen whether the contract with Geyer would be complied with. He denies all collusion with Geyer and Ferguson or with either of them, to defraud the creditors of Geyer. He denies all knowledge of the complainant's mortgage at the time of the sheriff's sale. The respondent knows nothing of the authority on which the executions of Carr and Chenier were issued; he denies any agreement with Ferguson and Geyer or with either of them, respecting the repurchase of this land, other than that above mentioned, to wit: fifty or sixty days for the money to be paid him for his clients; he knows of no interest that Smith and Ferguson had in Turner's judgment; he had heard they held it, but how it was acquired, he knows not;—he does not know whether Ferguson had the control of any of the other judgments, and denies that he ever asserted, or that any other person within his knowledge did represent that the property was to be purchased for the benefit of Geyer's creditors by the respondent, or that the same was encumbered, and that incumbrancers only could safely buy, or that he made any other representations of a character calculated to injure the sale of the said property.

The answer of Geyer, admits his indebtedness to Easton, and the morgtgage as stated in the bill; the assignment of the mortgage &c. to the complainant by Easton —the judgment subsequently obtained by the complainant &c.—the sale by the sheriff—the purchase by Wash, and sale by Wash to Ferguson, are all admitted: he denies any knowledge that Wash was agent in the purchase for Ferguson, but believed that he acted solely as agent for his clients, William P. Bryan and Timothy M. Bryan and Frederick Dent, judgment creditors of the respon-

JUNE TERM
1836.

Russell
v.
Geyer and others.

dent; but he positively denies that Wash in the purchase or sale of the lots of land, acted either as agent or trustee for him. He admits the contract with Ferguson as set out in the deed from Ferguson to him and exhibited in the bill, but denies any other contract, agreement or understanding, between himself and Ferguson; and denies that this agreement was made to deceive or defraud his creditors in any manner. He denies that the judgment of Turner against him had been previously paid; on the contrary, the whole amount thereof was previously to this contract unpaid, and it had been assigned to John Smith and said Ferguson, then doing business under the firm of Smith and Ferguson, and the amount of said sum was included in the sum exacted by said Ferguson in the agreement between him and the respondent, and the whole amount thereof, was charged by said Smith to Ferguson, in the settlement of their co-partnership account, as the respondent is informed and believes. He admits Carr's judgment was satisfied, but does not know whether Chenier's execution was authorised by him, but says that Chenier's attorney, who had control of the execution, was present at the sale, and pressing it in order to have Chenier's judgment satisfied. He admits the sale to Collier by Wash, at his instance, as stated by Wash; and states Collier's agreement to reconvey to him on the repayment of the purchase money, at times in Collier's bond specified, but denies any contract with Collier calculated to hinder or defraud his creditors. He denies that he has any knowledge of the extent of Collier's information of the situation of the title to the property sold, but says that he had heard Wash state to Collier, that the deed from him to Ferguson had not been recorded and would be delivered up to be recorded; that he at the time did not know that the deed was recorded. He denies having said any thing about liens at the Sheriff's sale or that he knows of any thing said by others. He does not know whether Ferguson had the control of any of the judgments other than that of Turner nor what consideration he paid for it.

Collier came in and answered and the bill was dismissed as to him.

The complainant with leave amended his bill making Lindell a defendant and charging him with receiving a conveyance from Collier, Wash or Geyer and with a knowledge of the complainants previous claim and requiring him to answer, stating on what terms he purchased, on what securities he relied for the reimbursement

of his money, if the title should prove bad, what under-standing between him and Geyer &c. and if he had not made complainant an offer of compromise.

Lindell answering says, that he had heard that Geyer executed a mortgage &c., as in the original bill set out and that it was assigned to the complainant, that said mortgaged property was sold as stated in the bill and that Wash became the purchaser and conveyed to Furgerson, and that said Wash afterwards also conveyed the same property to Collier, and that said Collier has conveyed the same lot and premises (to respondent) that he is ignorant of the particulars and circumstances of the said several sales except that made to himself, and does not know of his own knowledge what were the considerations or reasons of the said several transfers and sales, but has heard and believes, that said sales were all honestly and fairly made for the considerations expressed in the deeds and denies all knowledge of any contract other than those expressed in the deeds referred to in the bill. He admits that Geyer did assign to him the writing called in the bill a defeasance executed by Ferguson to Geyer for the purchase of said lot. That in making his contract for said lot he negociated principally but not entirely with Geyer, and paid said Collier for said lot thirty eight hundred dollars, that he gave permission to Geyer to reside on the lot till the first day of May in the year 1828 as his tenant and at a 1ent to be paid by Geyer, and that he also gave Geyer a promise in writing that if he should on or before the said day last mentioned pay the respondent the sum of thirty eight hundred dollars and the amount of rent then due, the respondent would then reconvey the said lot to him, and denies any other agreement with Geyer, and denies ever having made to complainant an offer of compromise either directly or indirectly.

Ferguson in his answer states, that he was a partner of J. Smith under the firm of Smith & Ferguson; that he left St. Louis in the beginning of the month of December, 1821, at which time neither the firm nor he himself, had any connexion with Geyer, except that Geyer might have been a common customer, sometimes a little in debt to them, and again not so at all. Of Geyer's circumstances he knew nothing, except that it was commonly supposed he was embarrassed. He remained absent from St. Louis till October 1822, when he returned and found that his partner Smith, had during his absence, as he believed, in order to relieve Geyer and his family from the pressure of an execution, on the judgment of said Turner

JUNE TERM
1836.

Russell
v.
Geyer and others.

in the bill mentioned, and under which Geyer's goods had been seized and advertised to be sold, purchased and taken an assignment of said Turner's judgment; he is unable to say whether Geyer was indebted to the firm on any other account; but knowing that Wash, in order to secure the claims of certain persons, had purchased the real estate in the bill mentioned at sheriff's sale, and believing that Geyer had no means of discharging his said debt to Smith and Ferguson, he may have had and probably had frequent conversations with said Wash, and with said Geyer, respecting the practicability of adopting some course by which the claims represented by said Wash, and that of Smith and Ferguson, might be satisfied out of said property, and said Geyer at the same time, be enabled to satisfy, in whole or in part, the claims of his other creditors. He has examined Wash's answer and asks that it may be taken as a part of his own; and believes that the facts therein stated, are true and correct, with one immaterial exception, to be by him hereafter stated. He did as in the bill is stated and also, by Wash, purchase the real estate at public sale from Wash, for the sum of fifteen hundred dollars, but expressly denies that he did so with any design to defraud Geyer's creditors, or for Geyer's benefit, or for any other purpose than to secure the debts due as aforesaid, from said Geyer to Smith and Ferguson, assignees of Turner's judgment, and whatever else, if any thing he might have owed them; and denies that he had any interest in any other judgment against Geyer, unless it may have been in favor of Smith and Ferguson, and denies that until his return to St. Louis in October 1822, he had any knowledge of the mortgage to Easton, or of the assignment thereof to the complainant, or of the existence of any of the said judgments against Geyer, but is unable to say how soon after his return, he acquired the knowledge of these matters.

The exception to the correctness of Wash's answer, is that he believes, that the deed from Wash to him was immediately after its execution, handed by him in the presence or with the knowledge of Wash, to be recorded, although he doubts not that the circumstance may have escaped the recollection of said Wash; and that on the 11th day of July 1828, he and his wife, executed and acknowledged a deed to Collier for the property. He denies all unlawful combination &c.

Much evidence is preserved in the bill of exceptions. Alexander McAlister, a witness, deposes, that as administrator, he had a demand against Geyer, and would have

advanced the money, due to the clients of Wash, and accordingly spoke to Wash, perhaps the day after the sale, and desired to know of him, "what the agreement was, between the creditors of Geyer and himself, in relation to the payment of certain judgments against Geyer, under his control? observing to him that he had understood that an agreement did exist for the benefit of junior creditors; and that Wash, so far as he could recollect, gave him no satisfaction." Same witness, also stated that he then applied to Ferguson, offering to pay him the amount he had paid Wash, and his own claim, and that Ferguson answered that he was about to make a sale of the property to Geyer and if Geyer did not make the purchase he would let the witness have it.

JUNE TERM
1836.

Russell
v.
Geyer and others.

Several witnesses testif d to the value of the lot and buildings thereon; some m ing it seven or eight thousand dollars, all agreeing that the price of property was then very low in St. Louis and that great sacrifices were made at sheriff's sales. One witness thought that it would not then sell at sheriff's sale, for more than $2,500; and another, that it might perhaps have sold for $3000 or for $3,500—this witness who about that time, was, as he states, deputy sheriff, and made most of the sales, stated that when the executions under which property was sold, amounted to the value, or nearly to the value of the property; it was frequently sold for very inconsiderable sums, because, as he believed, the persons present expected the sheriffs in the executions, would bid the full amount of their executions. The same witness stated that the property in question at the time his deposition was taken, was worth $7000, but does not think that any cash sale could have been made in the summer of the year 1822, for more than $3,500 or at most, $4000.

The bill being dismissed as to Collier, his deposition was taken and his statements contained in it, correspond with his answer.

John Smith testifies, that he became security for Geyer, to borrow money to prevent his house and lot from being sold under Turner's judgment; Turner was paid and he thinks the judgment was assigned to him individually, and paid by him out of *his own individual funds.* Some time after, he and Ferguson were about dissolving their partnership, it became then necessary that the amount against Geyer should be paid, and he thinks he informed both Geyer and Ferguson so. The property was sold, the witness being at Philadelphia; he says Ferguson was his agent in his absence; he presumes he gave him leave

50

to issue execution on Turner's judgment. On his return home, he entered satisfaction on that judgment against Geyer, at Ferguson's request; and the books of the firm show that Ferguson was charged with $1064, 33, being the amount of the judgment and interest against Geyer up to the date of the transfer.

Chenier testifies that he did not order out execution on his judgment; and Carr states, that he having received a part of the judgment in his favor, ordered the execution to be returned.

No evidence was given to prove that either of the defendants connived at issuing any execution, over which he had no lawful control, or used any improper conduct, to prevent the property from selling at the best price; nor to prove that Wash and Ferguson were jointly concerned in the purchase, or that Wash purchased as Geyer's agent:

### J. SPALDING for appellant.

First position for appellant. 1. The sheriff's sale to Wash and deed thereunder, ought to be set aside and held of no effect. Because, the exns. of the Bryans, of Dent and of Turner, were not merely irregular, but wholly void, and no exns. inasmuch as they issued, on a confession before the clerk, in vacation.—Constitution of Missouri, page 53, article 5; 1 Missouri decisions, pages 56 and 512; Laws, 1st session, Missouri assembly, page 44, sec. 14; Geyer's Digest, page 248, sec. 17. And that liens commence on the day of the rendition of judgment, see Geyer's Digest, 264, sec. 59, and also 267, sec. 66, and laws Miss. Leg. 1st sess. page 93, so that there could be no relation back; Bryans' and Dent's judgments were under former. The subsequent entry of judgments in those cases in court, was a waiver of the judgments before clerk, if the latter would otherwise have had the force of judgments.

The officers of court, had no right to issue or enforce executions for the collection of fees—Geyer's Dig. 266, as to form of exn. Ib. 197, as to fees &c., also Miss. laws, 1821–2, page 62, as respecting fees; from all of which it appears that no fees could be collected, but those of the party; and therefore, officers had no control of the executions—2 Tidd, 977 and 1027. These remarks apply chiefly to the three first executions; as to the execution of Carr, it was ordered by pltf. to be returned without sale and the officer had no right to proceed on it. As to Chenier's exn., which is the fifth, it appears from Chenier's

testimony, that he knew nothing of the execution; and there is no proof that any other person had any thing to do with it; but the officer, except in the answer of Geyer, which says a third person, not the attorney, un·dertook the control of it; and if what is stated in that answer is material, it cannot be evidence on the issue between the complainant and the other defendants. The judgments of Jamison and Foster, which are the 6th and. 7th, were rendered subsequent to the date of the mortgage, and of course imposed no lien as against the mortgage. As to the Turner judgment, it may be farther remarked, that the levy of the execution on the chattels of Geyer, and then the release of them. without the consent of the other creditors interested in the lot, must be considered an equitable discharge of that judgment.—2 Ld. Raymond, 1072; 2 Bac. 720. If deft's. goods are seized on exn. the def. is discharged. It appears therefore, that in this sheriff's sale, the sheriff advertised to sell on judgments that did not exist, on exns. which were void and no exns.; on judgments which were antedated as endorsed on the executions which he held; that he proceeded for costs, without the authority, and against the order of the plaintiffs in some of the executions; how could those interested, particularly subsequent incumbrancers, be expected to bid? The owner of the mortgage, according to the sheriff, would have had to pay about $3000, on the judgments of Bryans, Dent and Turner, in addition to Carr's and Chenier's; whereas in reality, he was bound to pay only Carr's and Chenier's judgments, in order to obtain the property as security for his debt and advances. We say that under all these circumstances, that the sale ought to be set aside by a court of equity, and refer to the following authorities as similar or analogous cases—6 J. C. R. 411; 3 J. C. R. 332; 1 J. C. R. 402; Sugden on vendors, 18; 7 Monroe, 612 and also 7 Monroe 478. If the court would interfere, provided the purchaser Wash only were interested, then they cannot refuse to interfere in the present condition of the property: as all concerned had notice, or what is in equity equivalent, and therefore are considered as having no better equity than the first purchaser Wash, and are chargable with all equity against Wash.—2 Fonblanque, 151; whatever is sufficient to put a party on inquiry, is sufficient notice in equity,—16 Vesey, 250, possession in another person is such notice.—2 Mad. 323, notice before money paid or deed executed, is sufficient.—Sugden vendors, 532 —7 J. C. R. 65, notice before payment sufficient; and 1

JUNE TERM
1836.

Russell
v.
Geyer and others.

Atk. 384, notice after payment and before deed executed, sufficient—8 Wheaton, 474. Furthermore, Collier and Lindell, each of them bought a mere equity, and of course at their peril, subject to all other equities—7 Cranch, 48; 2 J. C. R. 608, and Collier bought of Wash, there being of record, Wash's deed to Ferguson—1 J. C. R. 574-5, and if the deed had not been recorded, yet Collier knew that such deed had been executed, and therefore, that the title was in Ferguson, although the deed might have been destroyed.—1 J. C. R. 422, the defendant Ferguson, not sufficiently denying notice, it is to be presumed.—3 J. C. R. 345, 1 J. C. R. 575, if notice not denied fully and explicitly, it is admitted.

Second position for appellant. 2. But if the court refuse to set aside the sheriff's deed to Wash, on the ground of the irregularity and injustice of it: yet Wash must be held as a trustee, invested with the legal title, first to satisfy Bryans' and Dent's judgments, and then to the use of Geyer and his creditors, or rather of his creditors. 1st he was trustee by express agreement—see his answer and Geyer's; also Fergusons adopting Wash's, and the depositions of Simonds, Dent, McAlister and Smith. 2. Being attorney in two exns., he was of necessity trustee—4 J. C. R. 118, an attorney cannot buy to his own use under exns. controlled by him—5 J. C. R. 44, as to an atty's. right to use his knowledge to speculate. 3. Ferguson had notice, as before shown, and therefore stood only in Wash's shoes; and as trustee; 4 J. C. R. 138, as to a formal trust. 4 J. C. R. 118, same doctrine, as to implied trust: and 1 J. C. R. 575, and this too though consideration paid. 1 Cranch, 100, a purchaser with notice of an equity, is trustee to the extent of that equity. 1 Peters, 309, as to the notice charging purchaser as trustee. 4. If the creditors of Geyer, were even ignorant that Wash held the property in trust, yet might avail themselves of it afterwards—3 J. C. R. 261; 4 J. C. R. 136. 5. Consent of the cestui que trusts (the creditors) was necessary to divest the trust, (4 J. C. R. 138) or decree of court. Even Geyer gave no consent to the sale to Ferguson, and if he acquiesced, it was because they had him in their power. 2 J. C. R. 100, lands held in pledge, are never sold but by decree; chattels may be. 6. Lindell and Collier had notice, or what is equivalent, as before shown. The deed from Ferguson to Lindell, places the latter in no better situation, being made pendente lite.—2 Fonblanque, 153 note and 1 J. C. R. 575-6, as to the rule of notice from lis pendens.—

7. Trustees, agents, exers. &c. generally those in nature of trustees cannot speculate on cestui que trusts or trust property—2 J. C. R. 30, as to general doctrine, 2 J. C. R. 252, that persons interested have a right of course to have sale set aside. A case somewhat analogous, for the trustee sold at public sale and was concerned in the purchase: such persons cannot act for their own benefit—1 J. C. R. 27, 394; 4 J. C. R. 303; 1 Mad. 110, 111. No such person can speculate in buying in incumbrances—2 Mad. 151; 2 Atk, 54: 5 J. C. R. 514, they are allowed only what they paid. 8. Considering the defendants as trustees, then the claims, they have to be allowed them, are Bryans', Dent's and Turner's judgments, which have been paid up by Geyer, viz: $1200 to Wash and $1000 to Collier, who advanced that and more too to Wash and Ferguson—Turner's judgment is to be taken at one half (see Smith's deposition) this calcution, is on the ground that those judgments had a preference. 9. If the court are of opinion that Ferguson is not chargeable with notice, then the decree must be given against Wash for the money, inasmuch as the lot has gone beyond the reach of the court—3 J. C. R. 344; 2 J. C. R. 116, 117: 1 J. C. R. 394 and 620.

Third position. 3. But the transaction may be considered as a mortgage. Wash in the first instance was mortgagee, holding the legal title, subject to redemption and having acquired it for the express purpose of securing certain debts. Ferguson also, after the legal title was conveyed to him, may be considered in the same light—2 J. C. R. 189: 2 Vernon, 83, an absolute deed, and defeasance executed afterwards: held a mortgage—4 J. C. R. 167, parole proof that absolute deed was meant as a security for money: it is a mortgage—6 J. C. R. 417: 7 J. C. R. 40, to same purpose, and that any agreement to change its character afterwards is void—Powell on mortgages, 117, 118, 119: 1 Vernon 138; Exton v. Greaves, is a case very much to the point—7 Monroe, 478, Yoder &c. v. Atterburn, page 480, the doctrine is laid down, as to purchaser at sheriff's sale, with right of redeeming,— that it is a mortgage.

Fourth. 4. As to the amount to be paid if the property is redeemable as a mortgage or trust, or in nature of either. 1. Geyer has paid $2,200, which more than satisfies Wash's and Ferguson's claims. 2. In addition to above, Ferguson and Wash received enough to make the sum $4,500: a part of this was raised on Wash's covenant, to be sure, but this gives to Wash no equity,

for first he had conveyed the title to Ferguson, and it was in Ferguson even though the deed were destroyed.— See 1 J. C. R. 422: so that Wash acted in his own wrong and on his own risk. 2. He was originally a trustee or in nature of trustee, and knew all the circumstances; and 3rd the money was borrowed by Geyer, and Wash was only his security; which he was tempted to become, because he was to share in the money raised. 3. Collier's advance was in reality a loan: and he stipulated for usurious interest (see depositions) this is to be lopped off, if he be considered as having a prior equity to complainants.

Fifth. V. Complainant has a judgment at law for the same debt secured by the mortgage, on which execution has been issued and levied—2 J. C. R. 296: 4 J. C. R. 671, 682, 687: 5 J. C. R. 280, that a creditor in such a situation has a preference—2 J. C. R. 144, shows that when a creditor has done this, he can inquire into the disposition of his debtors property.

Sixth. VI. The complainant's mortgage, is however, the oldest lien and binds the property.—See authorities above, 1 Fonblanque, 320: 2 J. C. R. 608, show that the oldest equity has a preference. 1 Brown, 352, a case in point, showing that when the legal estate is outstanding, any person advancing money on the property relies entirely on the honor of the seller, as all prior equities must have a preference.—2 P. Williams, 495: sess. acts 1820, page 22, makes void a deed in law or equity, if grantor has made a previous deed: this act remained in force till 4, July 1825, and Wash's deed to Collier, is dated April 1825, and is of course embraced by that act—2 Atkins 64; 3 P. Williams, 250—to the effect that Russell is not volunteer.

B. ALLEN for the same:

The sheriff's sale to Wash passed no title. Reasons: The executions in favor of Bryan and Bryan, and of Dent, were nullities, being issued on the confessions before the clerk in vacation. The judgments on which they were issued, were liens only from the time of confirmation, 13, March 1822, subsequent to the mortgage. —See act of 1822, in force 1, March 1822, p. 93, sec. 61 —the decision in Missouri Reports notwithstanding, p. 512, see same, p. 512 and 56: con. of Missouri, art. 13, sec. 17 and art. 5, sec. 1. The execution in favor of Turner was a nullity for the same cause; the judgt. on which it issued was a lien only from the return day of the term of its entry, 3rd Monday of Aug. 1831—see Geyer's Dig. p. 264, sec. 59, but then see ib. p. 267 sec.

66, where it says the sheriff's deed shall only pass such interest as deft. had at the time of judgt. rendered. The execution in favor of Carr, was ordered to be returned by plaintiff before the sale.—See acts of 1804, p. 23, 24: Geyer's Dig. p. 260, sec. 48, 50, 51; p. 265, sec. 61: p. 256, sec. 35 and p. 197: sec. 18, 19, acts of 2nd Sep. of 1 Gen. Assy. p. 67, which repeals above sec. 18, 19, p. 4, of acts of 1820 and 372 of Geyer's Dig. The sale under the execution in favor of Chenier, (admitting it to be good, which it was not, being without authority of pltf. See p. 44 of acts of 1820; and p. 122 of Geyer's Dig.) alone or jointly with the one in favor of Carr, cannot be valid: because the sale appears to have been conducted under a mistake and that brought about by the def.— Wash a lawyer and agent of the parties whose interests were advanced by the sale, and by the representations made, in representing the judgts. in favor of Bryan and Bryan, and of Dent, to be the oldest liens, and the executions on them to be first satisfied: these are such circumstances, as to render the sale unfair, and to induce a court of equity to say the title did not pass by the sale to Wash. If the sale be set aside for these reasons, the property should be exposed to sale, to satisfy the liens on it at that date according to their priority: except Carr and Chenier, which are satisfied. Ferguson, if a purchaser with notice, cannot complain; and if without notice, (but he expressly takes Wash's right, subject to all its impurity and defects, —see the deed) he can only be interested to the amount of what he bid at auction, $1500, of which he has been paid one half by Wash, and the remaining half can be a lien on the property, and thus equity done to all—for Collier relied on the warranty of Wash, and Lindell was a purchaser with notice, or may avail himself of the warranty in the deed from Wash to Collier. If the sale to Wash be good, he is to be considered a trustee. The purchase was not absolute for his own benefit, but was in trust for the respective interests of the parties to the execution; and the defendant or his assignee had the right to redeem; Wash was the attorney, and agent of the pltffs. Bryans and Dent or his asse. Gilman &c.—See Howell v. Baker, 4 Johns. ch. Rep. 118: exparte Hughes, 6 Vesey, 617: exparte Lacey id. 625; Lister v. Lister, id. 631, Wormley v. Wormley; 8 Wheaton 421, exparte James; 8 Vesey, 337; Devoue v. Fanning; 2 Johns. ch. Rep. 252. Ferguson coming into possession of the trust property with notice of the trust is chargeable as trustee; and is bound with respect to that property

JUNE TERM
1836.

Russell
v.
Geyer and others.

JUNE TERM
1836.

Russell
v.
Geyer and others.

to the execution of the trust.—See Howell v. Baker, 4 Johns. ch. Rep. 118, Wormley v. Wormley; 8 Wheat. 421, Shepperd v. McEvers: 4 Jons. ch. Rep. 236; 2 Mad. ch. 125; 1 Schoale and Lefroy, 262; 1 Peter's Rep. 309, Daniels v. Davidson; e6 Vesey, 249. If Ferguson was not affected with notice at the time of the sale, he was before the purchase money was paid, which is sufficient: the mere security of it does not avail, it must be actually paid.—See Wormley v. Wormley, 8 Wheat. 421; 7 Joh. ch. Rep. 65. If it be considered a trust, the sale was a violation of the trust. It was made without notice to Geyer, without his consent and during his absence from the place; (it is not shown what was done with the overplus, arising at auction sale,) the terms of its execution were not prescribed, and Wash acted with bad faith in making the sale.—4 John's. ch. Rep. 186. The complt. being the assignee and judgt. creditor of Geyer, is entitled to the aid of chancery in subjecting this trust property, as held by Wash. to the satisfaction of his demand, or in other words to redeem it.—Howell v. Baker, 4 John. ch. Rep. 118, Hendricks v. Robinson et al; 2 John. ch. Rep. 283, Brinkenhorf et al v. Brown et al: 4 John's. ch. Rep. 671, recognised in Williams v. Brown et al. id. 682, McDermott et al v. Strong et al: id. 687, Spaden v. Hadden; 5 John's. ch. Rep. 280, same case 20: John. Rep. 554, Davoue v. Fanning: 2 John. ch. Rep. 252. No objection to redemption by Russell arises from the conveyance by Wash to Collier, because Collier loaned the money on the covenant of Wash—1 Fonb· Eq, 320, and cannot be considered as purchasing the property, (Wash had no title, he had conveyed to Ferguson,) but if a purchaser, he is only so in equity, and of the two equities Russell and Collier, the former has the preference, being prior in point of time—1 Fonb. Eq. 320, qui prior in tempore est potior in jure, and this application of the maxim is not prevented by the conveyance of the legal estate from Ferguson to Collier, because when Collier purchased his equity, he had notice by the registry, of Russell's equity—1 Fonb. Eq. in notes, 320, that is sufficient notice which puts a party on enquiry.—Sug. on vendors, 532, and authorities there cited,—2 Fonb. Eq. 151. Again, Collier should be postponed to Russell, because he is to be considered a purchaser with notice of Russell's equity: and in this way, Wash had not the legal title, having conveyed it to Ferguson: of this conveyance, Collier had legal notice by the record; this was sufficient to put him on enquiry, and so amounts to notice

—Sug. on vendors, 532; his answer shews he took no pains to inform himself, relying on the covenant of Wash. Again, Collier acquired no interest by the deed from Wash to him, it was void—act of 6, Dec. 1821. In the same manner, Lindell is to be considered a purchaser, with notice of Russell's equity,—Sug. on vendors, 532. Further, he is a purchaser with notice of the claim set up by Russell to this property. Again, he is only a purchaser in equity, and being subsequent in point of time to Russell or having no better claim than Collier, he is to be postponed to Russell. Again, the deed to him, passed no title, for Collier had none. The deed from Wash to Collier, passed no interest.—Act of 6, March 1821. Should Wash be considered a trustee, but Russell, not be entitled to redeem as against Collier and Lindell, yet he will be entitled to all the gain made by Wash, not by the auction sale merely, but by the sale made to Collier.— Green v. Winter, 1 J. ch. R. 27, Parkes v. Alexander, id. 265, Schieffelin v. Stuart; id. 620, Moore v. Pickets, 4 John. ch. Rep. 303: 8 Wheat. arguendo, 435, or Wash having sold the land contrary to his duty as trustee, is answerable for its value, not as it existed at the time of the sale, but at the time of the filing of the bill—Shepperd v. McEvans, 4 John's. ch. Rep. 136, Hart v. Ten Eyck: 2 John's. ch. Rep. 62; 3 John's. ch. Rep. 343-4, as to the objection that the other creditors were not made parties, it may be answered, their claims are satisfied.—See also, the authorities: Hendricks v. Robinson; 2 John's. ch. Rep. 283, note to Wormley v. Wormley, 8 Wheat. 451, anon. 2. Atk. 14, Cooper's eq. plead. 289, Jones v. Jones: 3 Atk. 111; 2 Mad. ch. 320, 173. Collier bought the property under an agreement with Geyer to permit him to redeem, this made it a mortgage—7 John's. ch. Rep. 40, 1 Powell on mortgages; 116 and 118;—and 119—1 Vernon 138, 1 John's. ch. Rep. 594: 4th id. 167, 6th id. 417.— Lindell was a purchaser of Collier, with notice of Geyer's right to redeem—see Collier's deposition. Wash the purchaser at sheriff's sale, by his conduct, deterred others from bidding: hence the sale is not binding and will be set aside.—Sugden on vendors, 18 and notes. No objection arises from the conveyance to Ferguson, he being a purchaser with notice of the conduct of Wash: nor to Collier, nor Lindell, they being purchasers, with notice of Russell's equity; but if the sale cannot be set aside, in consequence of these conveyances, Wash must answer the consequences of his conduct, to the value of the property, either at the time of the sale or of the filing of the bill.                51

JUNE TERM
1836.

Russell
v.
Geyer and others.

H. R. GAMBLE for defendants.

I submit, 1st. That Wash was not a trustee, by reason of any express agreement, and that he could not make himself trustee for the benefit of others, against the interest of his clients. 2nd. That there were no circumstances, from which the court can imply a trust. 3rd. That if a trust could be implied, it must be of such character, as is consistent with the rights of Wash's clients; and therefore, a sale would be necessary to secure their rights, and such sale was made to Ferguson. If Wash was not trustee, the bill must be dismissed; and so also, if he was trustee, with power to sell for his clients' benefit. 4. If he was trustee, Ferguson was not a trustee: because he had not notice of Wash's character. 5. That the deed exhibit, D. No. 4, is an agreement that cannot be enforced, and has been entirely waived. 6. That Collier was substituted for Ferguson, and Lindell for Collier, so that the title is in Lindell, free from the complt's. speculation in a dead mortgage.

Opinion of the
court.

McGIRK Judge, delivered the opinion of the court.*
The points made by the appellant, are 1st. That the sheriff's sale to Wash, and the deed under it ought to be set aside and held of no effect. 2nd. That if the court refuse to set aside the deed of the sheriff to Wash, on account of the irregularity and injustice of it, yet Wash must be held as a trustee invested with the legal title, first to satisfy Bryans' and Dent's judgment; and then to the use of Geyer and his creditors, or rather of his creditors. 3. The transaction may be considered as a mortgage; Wash in the first instance was a mortgagee, holding the legal title, subject to redemption, and having acquired it for the express purpose of securing certain debts. Ferguson also, after the legal title was conveyed to him, may be considered in the same light.

1st point. The reasons assigned for maintaining the first point, are first, that the judgments of Bryans, Dent and Turner, being by confession before the clerk, are nullities. And secondly, that no executions can issue on such judgments; and thirdly, that Carr ordered his judgment to be returned; and Chenier had never ordered his execution out: and that the other two judgments were of date, subsequent to that of the deed, and therefore had not the priority of lien.

---

*Wash Judge, being interested.

1. It has been decided once, that a judgment by confession before the clerk of the circuit court, is legal—see Finley and Bryson, admrs. Caldwell, 1 vol. Mo. decis. p. 512. The court being willing to hear argument again on that subject, it was contended that, by the fifth article of the constitution of this State, the judicial power, as to matters of law and equity, shall be vested in a supreme court, in circuit courts, and in such inferior tribunals, as the general assembly may from time to time, ordain and establish; and the clerk of the circuit court, not being a judicial officer or an inferior judicial tribunal, within the contemplation of the constitution, any judgment confessed before him, would be void. By the act to establish circuit and county courts, passed 28th November 1820, the office of clerk of the circuit court is created; the 14th section of that, prescribes his ministerial duties, and then declares that the clerk of the circuit court, shall have power and authority, to enter up judgments by confession, in time of vacation, by the defendant and plaintiff, his attorney or agent, appearing in their proper persons, and the defendant acknowledging that he justly owes the debt; and the said clerk, shall accordingly issue execution upon each confession of judgment, in the same manner as though judgment had been obtained in open court.— Had the clerk been authorised to call parties before him, and to hear and decide causes, little doubt could be entertained, that the act of assembly, so far as it confers this power, would be void. But in matters of contract, it may be safely assumed as a truth, that any man of mature age may renounce the law made in his own favor. This power conferred on the clerk, seems granted for the ease and convenience, both of debtor and creditor: the creditor is better secured, and the debtor has it in his power to make his terms with his creditor, and give him a judgment at a very inconsiderable expense. However excellent the trial by jury may be to settle disputed facts, it can't be doubted that it is better that debtor and creditor, when they can do so, should settle their affairs between themselves, than by the intervention of a court and jury. It is argued that great frauds and impositions might be practised in such proceedings before a clerk, a man for the most part, unskilled in law, and always discharging those duties in private. It might be asked whether fraud cannot enter the court house in term time, while the most enlightened and upright judge occupies the bench? and whether it is not expected even there, that each suitor should attend to his own interests? But

JUNE TERM 1836.

Russell
v.
Geyer and others.

A judgment by confession before a clk. of the cir. court, is legal and the statute which authorises suc judgts. is constitutional.

JUNE TERM
1836.

Russell
v.
Geyer and others.

if this argument avail any thing, it would equally serve to prove that deeds of trust, made for example, by A. to B. to secure to C. the payment of a sum of money, to be paid on a given day, with power to sell, in case of non payment, ought not to be tolerated; yet, throughout our country, it is common to transact business in this way, and the legality of such deeds has not yet been questioned. The deed of trust too, is a private transaction.—The judgments confessed by the debtor, before the clerk, an officer known to the law, and who is selected for his abilities and integrity; the debtor being present, one would suppose, would be much less liable to be infected by fraud. If it be admitted, that a man, who is permitted by the law, to manage his own business, without the intervention of guardian, ought not to confess a judgment before a clerk of a circuit court, because frauds might be practised on him; it might successfully be contended, that for the same reason, he ought not to give a bond, execute a mortgage deed, or indeed, to make any contract, except before the circuit court. For a man wants time only, to obtain judgments on any contract of any nature whatever; but that judgment, whether confessed before a clerk in vacation, or rendered by the circuit court, will be equally vitiated by fraud in obtaining it. A judgment confessed before a clerk under our statute, is the conclusion of law on a contract acknowledged of record; and so far as public convenience, ought to be regarded in deciding on the constitutionality of the act, permitting such judgments to be confessed, it would seem that they ought to be greatly favored.

*The circuit court cannot make such judgments its judgments, and thereby alter the time when their lien would commence.*

But, another objection to these judgments was, that being at a subsequent term entered up as judgments of the circuit court, they became merged in the higher judgment: and all of them being entered as judgments of that court after the 14th of November 1821, the day when the mortgage of Easton was recorded, then Easton has the first lien. If indeed, those judgments confessed before the clerk be void, no subsequent action of the circuit court can help them. But if, as it has been before decided, they were valid in themselves, then the action of the circuit court on them, can do them no injury; that court cannot, if the act under which they are rendered be constitutional, make them its judgments.

*Where an attorney directs an execution to issue, contrary to the instructions of his*

The judgments in favor of Carr, and Chenier were rendered by the circuit court: to them, there is no objection; but it is said that a part of Carr's judgment being paid, he had ordered his execution to be returned: and

JUNE TERM
1836.

Russell
v.
Geyer and others.

Chenier had not ordered one out and knew nothing of it. Admitting that it were true, that Carr having ordered his execution to be returned, that neither Chenier nor his attorney had ordered out his; and furthermore, that the sheriff, as is now perhaps for the first time contended in Missouri, had no right to sell property to make his fees, how would this effect the purchaser at sheriff's sale? Bad indeed would be the condition of the judgment creditors, and indeed of honest debtors, if the purchaser were required to look into the correctness of the sheriff's conduct in his sales: for there would be few purchasers, and the property would consequently be sold for very little. But for what purpose is it that sheriffs are required by law, to give bonds for large sums of money with good security, conditioned that they faithfully perform their duties &c. If we advert to the practice under our own laws, the proper question to have been put to Chenier, to prove that the execution was improperly issued, should have been, whether he forbade his attorney to issue one? and even had he done so, it would then have been necessary to affect the purchaser with the fraud of the attorney, by proving him informed of it; nothing of this kind is attempted: and both Geyer and Wash, deny all knowledge of the authority by which it issued; and Geyer positively alleges that the execution was pressed by Chenier's counsel. All this however, is immaterial, so long as the defendants are not implicated in causing the execution to be improperly issued. The execution of Jamison, the complainant observes, is later in date than the mortgage of Geyer to Easton, and consequently adds, the mortgage has the first claim to be satisfied. By the law then in force, an instrument of writing, conveying an interest in *land, imported notice of the sale of the land therein mentioned,* from the day of recording it only.—See act supplementary to the laws of the territory, establishing a recorder's office, approved 1st Feb. 1817, p. 119, of pamphlet edition. There were then in the hands of the sheriff, on the day of the sale of this property, three executions, on judgments rendered in the circuit court, on each of which, this property was liable to be sold. But if, as it has been before decided, (see Finley and Brysom, admrs. v. Caldwell, 1 vol. Mo. decisions, p. 512,) the three first judgments above mentioned be good, the executions are also: for the defendant, if he had a right to confess a judgment before the clerk, may also lawfully suffer an execution to issue in pursuance of the statutory provision. For, to resume the

client, and the sheriff sells property under the execution, it is yet necessary, in order to affect the purchasor at the sheriff's sale, to prove him informed of the fraud of the atty.

JUNE TERM 1836.

Russell
v.
Geyer and others.

comparison of the judgment confessed before the clerk with the deed of trust, if it be found a proper thing that a man should confide to a trustee, the power of selling his property, on conditions prescribed in the deed, to satisfy a debt which he may fail to pay; certainly it could not be more imprudent to allow the clerk, a public officer, to issue execution, to enable the sheriff to raise money which the debtor had confessed before the clerk to be due. In short, it cannot be doubted, that there would be much less risk to the debtor, whose goods, the sheriff, a public officer, liable to be proceeded against in summary manner by the court for any misconduct in office, and liable also on his bond, than to him whose goods are sold by a trustee. There seems to be no reason why the executions issued on these judgments should not be valid, and the sales under them good. Charges were made that improper means were resorted to by the defendant Wash, to hinder purchasers from bidding at the sale; he denies these charges, and no proof has been made against him.

The second point is, that if the sheriff's deed to Wash, be not set aside, yet Wash must be held as trustee, invested with the legal title, first to satisfy Bryans' and Dent's judgments, and then to the use of Geyer's creditors.

*The atty. for pltfs. in execution, purchases the property at sheriff's sale, professing at the time to act as agent for his clients, and with a view to the payment of their executions.—he holds the property for 6 or months, to give the def. in execution time to pay off the execution, and with a promise in that event to reconvey to def.—finally the def. failing to make any tender, he sells the property at public auction, to satisfy the demands of his client: Held, that there being no evidence of fraud, on the part of the* —

It is insisted, that Wash made himself trustee, and reference is made to his answer and to that of Geyer, as well as to the depositions of Dent, Simonds, McAllister and Smith. His own answer is stronger against him than the evidence of any of the witnesses. Dent, the only one of these witnesses perhaps, whose testimony has not been set out, says he was present at the sale, that Wash was his attorney, and he enquired of Wash as to the payment of his judgment against Geyer above mentioned, and that Wash answered the judgment should be paid. Wash declared at the sale, that he did not wish to purchase the property, that he would make it satisfy his clients' debts, and if he were compelled to purchase it, he would receive the amount of his clients debts, if paid in 50 or 60 days, and would convey the property to Geyer or his creditors. Geyer states that he promised to do the same, if the money were paid in a reasonable time. What would be a reasonable time in such a case? There can be no doubt, that in the purchase of this property, a court of chancery would view him as the agent of his clients, Wm. P. and T. M. Bryan, and Frederick Dent; and as such it would be his duty, either to sell the property to raise money to satisfy their judgments if he

could, or to hold it for their use. He waited it seems by his answer, much longer than he promised, and it is not charged that he sold in less time, than he says he agreed to wait. To show his liability in consequence of being attorney, two cases are cited from Johnson's chancery Reports—the first, Howell v. Baker and Clark, 4 J. C. R. p. 118. The facts were these: Boyd had recorded a judgment against Howell, for $112, 50; the property of Howell being a house and forty acres of land, were advertised to be sold; on the day appointed for the sale, he paid the attorney of Boyd fifty dollars and the sale was postponed; he paid at another time more money; the property was again advertised and sold, and the attorney became the purchaser for ten dollars. Howell tendered the attorney the balance due on the judgment, together with the ten dollars paid by him. It appeared in evidence that it was worth $2000 when it was sold at auction. That Howell was absent from the State at the time; that it was a stormy day and nobody but the deputy sheriff and the attorney, were at the sale; and that after the sale, the attorney frequently said he would give up the property to Howell, if he would pay the balance due on the judgment, and the ten dollars and compensate him for his trouble. The attorney sold the land to Clark, for $1200, and it was decreed that the plaintiff Howell, should have leave to redeem his land, Clark having purchased with notice. The chancellor says the defendant was one of the attorneys to the execution under which the sheriff sold the land; and it might be questioned whether an attorney can in such a case, become a purchaser for his own benefit: he is the agent of the plaintiff and generally has the control of the execution, and may direct the time and place of sale. It is well known that the sheriff receives his instructions from the attorney, and usually follows them under the general regulations of the statute, in pressing or in postponing the sale; and as to the terms prescribed and the particular parts of the real estate to be selected. It is dangerous to allow a person, who has such a material agency in the sale, the capacity of buying in on his own account—he who is intrusted with the business of others, ought not to be allowed to make that business an object of interest to himself. It tends to abuse and corruption. It is upon this principle, that the assignees of a bankrupt are not allowed to become purchasers on the sale of the bankrupt's estate, the bringing of it to sale and the time and manner of sale, are very much in their power. A purchase by

*atty. arising from gross inadequacy of price or otherwise, either at the sheriff's sale or the sale at auction, he is not to be considered as a trustee for the benefit of the def's. creditors, and the purchaser takes a good legal and equitable title.*

JUNE TERM
1836.

Russell
v.
Geyer and others.

the solicitor of the assignees, is supposed to be within the mischief of the prohibition, for he is their agent to direct the sale; and those who have a duty to perform for others, should not in the discharge of that very duty, deal for themselves. Chancellor Kent, then cites English authorities, to show that purchasers of bankrupts' estate, at public sale by the assignees or their agent or solicitor, are not valid, but will be considered as made in trust for the persons entitled to the surplus, and be set aside on equitable terms. The purchase by the defendant in that particular case, he declines deciding on the general rule. It was made he says, under special circumstances, which are sufficient of themselves (and particularly when taken in connexion with his character as attorney to the execution,) to constitute him a trustee for the parties, whose interest were concerned in the sale. Boyd, who was plaintiff in the execution, directed the defendant to attend and bid off the property, and the defendant, afterwards confessed to his client that he had done so; and that the deed would be executed to Boyd. He also admitted to Howell, the defendant in that execution, that he had made a temporary sale of the property, to prevent the expense of further advertising it; and that he would give a receipt on the execution as soon as it was paid up.—— These two witnesses establish the fact, that the purchase was not intended at the time, to be absolute, and for the benefit of the defendant. Thus constituting himself attorney also for the defendant in the execution. Indeed, continues chancellor Kent, such gross inadequacy of price, when taken in connection with the fact, that the sale was on a stormy day, and that no persons were present but the sheriff and the defendant, would well warrant the inference of fraud, on any other grond than the one I have taken. The most reasonable conclusion, and the only honorable one, to the defendant is, that the purchase was intentionally made at the time, in trust for the respective interests of the parties; Howell did nothing, afterwards, to release his right and discharge the trust. The second authority cited, to prove Wash's liability, is Arden and others, against Patterson and De Hart. Patterson was an attorney, who had been employed by the plaintiffs in this action, in the cause cited, to prosecute a suit for them: they failed for want of evidence, and were condemned to pay more than three hundred dollars in costs. Patterson however, in consequence of his situation as attorney in that cause, had acquired information, which if it had been communicated to his clients, would

have enabled them to renew their action, with a moral certainty of success. This information he conceals from them, and purchases, for a very inconsiderable sum, their right of action. Chancellor Kent decreed that he should be held as a trustee for the benefit of his late clients, of the amount he had recovered, in the right of action he purchased of them, without communicating to them the information he had acquired as above mentioned. Another cited from Vesey, vol. 8, p. 337, shows somewhat more than chancellor Kent, in his opinion first above cited, had said that a soliciter to a commission of bankruptcy would not be permitted to bid upon the *resale*, discharging himself from the character of solicitor, without the previous consent of the persons interested freely given upon full information. In the case of Howell v. Baker, 4 Johnson's ch. Rep. 118, first above cited, chancellor Kent lays down the broad rule. The attorney is the agent of the plaintiff, and generally has the control of the execution; this rule prevails here. By special circumstances, in this case of Howell v. Baker, the attorney was made trustee, for the benefit of the owner of the land sold, who was defendant to the execution. Let us compare the situation of the defendant in the cause under our consideration, with that of the attorney in the case cited. For there is not only the presumption of law that he was agent of his clients, but Dent, one of the plaintiffs in the execution, in his deposition recognises him as his agent, and asks him before the sheriff's sale how his judgment was to be satisfied; and but for the defendants answer, that his judgment would be paid, Dent declared he should have made a bid for the property. The defendant in this cause declared at the sale, his intention to make the property bring the amount of his clients' judgments, that is, Bryans' and Dent's and that he would be glad to receive the amount of his clients' judgments, either from Geyer or any of his creditors; and that should he become the purchaser, and the amount, of said judgments should be paid to him in fifty or sixty days, he would reconvey to said Geyer, or to any trustee the creditors might name. After the sale, the same thing was repeated to Geyer. He waits a much longer time than fifty or sixty days, the time he had agreed to wait; and learning from Geyer that he could neither raise the money himself nor prevail on his creditors to do it, he determined to sell the property, to raise the money, to send to his clients; and accordingly did sell it. The property was sold at the court house door, during the session of the circuit court. Our law

leaving to the attorney no power to direct either the time or place of sale, as it appears from chancellor Kent's opinion, the attorney could do in New York. Here the attorney having bought the property declares that he will assume the responsibility of holding the property for the use of Geyer or his creditors, 50 or 60 days, and if within that time, he or any of them, will pay him the amount of his clients' judgment, he will reconvey &c. Instead of 50 or 60 days, he waits 6 or 8 months, and Geyer declares his inability to raise the money, and the unwillingness of his creditors. In the other case, the attorney was directed to bid off the property; and he confessed to his client, that he had done it, and said that the deed shoutd be made to him. He too, promised that the owner of the land sold, and defendant in the execution, might redeem if he would pay the money due on the execution. In good time the balance due was tendered to him, and he refused to accept it; and sold the land for $1200, for his own use. Wash after waiting a much longer time than he had promised, sells the land to satisfy the demands of his clients, the defendant in the execution making him no tender. The presumption is fairly raised, that their judgments are satisfied, for they do not complain; and evidence is given that Turners's judgment also was satisfied, making a sum of about $3000, according to the estimate of the complainant's attorney; and $2700, according to that of Ferguson, one of the defendants. But it was contended that Turner's judgment, must in equity, be considered as discharged, because he had once executed Geyer's chattels and released them without the consent of the other creditors. From the testimony of John Simonds, it appears that in December 1821 or January 1822, an execution was issued on this judgment, in favor of Turner; and that on 28th of January 1822, he returned it unsatisfied, by order of John Smith, who stated that the execution was assigned to him, Smith directing Geyer's personal property taken in execution, to be restored to him and released. From Smith's deposition, taken by the complainant, it appears that in taking this assignment, he acted as the friend of Geyer, and became his security to borrow money to pay Turner the amount of his judgment; and that the assignment of the judgment was made to him in consequence of his becoming the security of Geyer; and when the judgment was afterwards satisfied, he entered satisfaction on it. The house and lot was sold on the 10th June 1822, and Turner's first execution being returned on 28th January preceding, another must

have been issued.  To suppose that an execution issued on a judgment and returned as that was, for the ease and comfort of the defendant, and at his probable request, should be considered a discharge (in equity) of the judgment, would be strange indeed.  We consider it no discharge, and that Turner's judgment was for that matter, in full force.

Contrasting then, the conduct of the attorney in the case we are to decide, with that in the case decided by chancellor Kent, it may be said that the one appears wholly bent on raising his clients' money, with least inconvenience to the defendant, and at the risk of his clients' displeasure, waits 6 or 8 months for the defendant to pay the amount of his clients' demands before he sells.  While the other disregards the instructions of his client by bidding off for himself, the land which he had been requested to bid off for his client; and when offered the amount he had paid by the defendant in the execution, together with the balance due, he refused to accept it, and sold the land for his own use.  It remains to be enquired, whether the house and lots were sold for a price so inadequate, as to raise the presumption of fraud? It will be remembered that the time and place here, are regulated by law, and are not to be altered by an attorney, or in any way prescribed by him, as we learn from chancellor Kent, they might be in New York.  We have seen, that at the sheriff's sale, the conduct of the attorney was not proved to be such as charged in the bill.  It then is necessary only, to enquire into the sale at auction.  One witness states, that the improvements cost more than ten thousand dollars: other witnesses state that they were worth from six to seven thousand dollars. These last witnesses agree, that at the time of the sale by the sheriff, property sold very low; and that very great sacrifices were made at sheriffs' sales.  One witness, John K. Walker, who says he was deputy sheriff at the time, and whose testimony has before been adverted to, states that the property in question could not in the summer of 1822, have been sold at a higher price than $3500, and probably for not more than $3000.  John O'Fallon, another witness, whose testimony has also been adverted to, states that he was acquainted with the property in question, that he frequently attended sheriffs' sales of real property, and sometimes purchased—property at that time was very low, and the witness did not suppose that the property in question would have brought more than $2500 at sheriff's sale, for cash at that time.  Witness stated that

he called on Ferguson while he claimed that property, to purchase it for a friend, on that friends representation that it could be purchased for $4000, and on a long credit. His recollection was, that Ferguson said that was the price he asked, but he could not wait so long. It would seem that the very circumstance, that Geyer could not raise the money on the credit of his house and lots, to satisfy the executions of the Bryans and of Dent, controlled by Wash, within the time allowed him, viz: 6 or 8 months, ought to repel any presumption of fraud arising from inadequacy of price, when the property was made to satisfy the executions not only of the Bryans and Dent, but also that of Turner, which as has been observed, had been assigned to Smith, and who it will be recollected, was at the time of the sale absent, and had entrusted this with his other business to Ferguson—see his deposition in the bill of exceptions. Seeing then no evidence of fraud in the conduct of the defendant, either in his conduct at the sale by the sheriff or at the sale at auction, we are led to the conclusion that he cannot be considered as a trustee for the benefit of the complainant. It remains to be considered whether the complainant can be aided by the terms of the several bonds, made first by Ferguson to Geyer, and secondly, by Collier to the same, and lastly, by Lindell to Geyer.

After Wash sold to Ferguson, Ferguson executed to Geyer a bond, binding himself to convey the property to Geyer, in consideration of a sum certain paid down, and also, in consideration of certain sums to be paid at times therein specified, conditioned to be void in case Geyer failed to pay any of the instalments or interest that might accrue. After some time, Geyer finding himself unable to make the payments, applied to Collier, who paid up for him the money due, and took a conveyance, first from Wash, and afterwards from Ferguson when it was found to be necessary, who executed to him a bond to convey, on conditions similar to those contained in Ferguson's bond. Again Finding himself unable to make the payments within the times fixed in the bond, he applies to the defendant Lindell, and Collier at his request conveys to Lindell. Had the complainant tendered to Ferguson the several sums of money which Geyer contracted to pay to entitle himself to a conveyance of the land, or had he applied to a court of chancery to have the benefit of the bond made by Ferguson to Geyer, offering to pay the several instalments as they became due, it might probably have been successfully contended that he might be substi-

Atty, for plaintiffs in execution, purchased at sheriff's sale, and after some months sold to A. in order to raise the money due his clients. A. gave his bond to def. in execution, to convey the property to him, in consideration of certain sums paid down and other sums to be paid at specified times, conditioned to be void in case of a failure to pay at the time;—def. failing to raise the money, applied to B. who advanced it for him, and took a convey-ance to himself, and gave a similar bond to def.— Again failing to

JUNE TERM
1836.

Russell
v.
Geyer and others.

tuted to Geyer: but he waits till at Geyer's instance, the property is conveyed to Collier, and by Collier again to Lindell: as all his title is to be derived from Geyer, if he have no claim either against Collier or Ferguson, the complainant can have none.

Lindell in his answer states that he paid Collier for the premises $3800, and gave Geyer a promise in writing to convey the premises to him, if he should before the first day of May 1828, pay him the sum of $3800, and the amount of rent then due.

Lindell filed his answer on the third day of April 1828, and on the first day of May then next, Lindell states that Geyer's right to purchase the premises ceased. No evidence appears to have been given on this point. We are then to take his answer as true, as he was required to state the agreement between him and Geyer.

Can Geyer himself now come in and compel Lindell to convey to him, on the payment of the purchase money? The case of Benedict v. Lynch, cited by the defendant's counsel, is in point—see 1 Johnson's ch. Rep. 370. This was a bill for the specific performance of an agreement for the sale of land, the plaintiff stated that on the 28th March 1810, he contracted with the defendant for the purchase of land described in the agreement signed by the defendant, which was as follows: That it was thereby agreed between the parties, that the defendant sell to the plaintiff a piece of ground (described therein) containing thirty-nine acres, at fourteen dollars and fifty cents per acre; and upon the following conditions being performed, to wit: that the plaintiff pay to the defendant $250 in one year, (March 1811) one third of the remainder in one year thereafter: one third the next year: and the balance the year following: with interest annually on all the sums; and upon his complying with the payments, the defendant agreed to give a deed. If the plaintiff failed in the payments or any of them, the agreement to be void. That the plaintiff made and delivered to the defendant a counter part of the agreement. That the plaintiff took immediate possession of the land, cleared 8 acres, and built a house thereon; but in consequence of unforeseen disappointments, failed to make his payments; that in order to induce the defendant not to sue him for the purchase money, the plaintiff subsequently to the above contract, agreed with the defendant to clear five acres in one year, and in consideration thereof, the defendant promised not to prosecute the plaintiff during that year. That he had since procured and tendered (in

*[margin note]* raise the necessary sums, to entitle himself to a conveyance, the def. applied to C. and at his request, B. conveys to C. who gives def. a written promise, that on the payment of a specified sum on a day fixed, he would convey to him.—Held, after the lapse of the time fixed on, the def. has no claim in equity for a specific performance of the contract, and consequently, his creditors have none.

January 1814) all the purchase money to the amount of $720, though the whole of it was not due; but the defendant refused to accept the money, alleging that the contract was void; and had brought an action of ejectment against the plaintiff. The plaintiff prayed for an injunction, which was granted, on the plaintiff's depositing the $720 with the register.

The answer admitted the agreement of 28th March 1810, and that it was without any other consideration therein stated; but denied the delivery by the plaintiff of any counter part of the agreement. The defendant admitted the entry of the plaintiff on the land, and the erections and improvements made by him, which he had used and enjoyed down to the time of the answer, without offering any compensation to the defendant. That he refused to accept the money tendered to him by the plaintiff, in February or March 1814, and to execute any conveyance. The defendant also stated, that in 1811 or 1812, the plaintiff often declared his inability to pay, and disclaimed all right to the premises, and relied wholly on the liberality of the defendant, to permit him to occupy the premises until the defendant could sell them. That in the spring, 1812, the defendant required the plaintiff to quit the premises; and the plaintiff then agreed that if he might be allowed to occupy the premises for one year, he would clear and fence five acres of the land, to which the defendant assented. But the defendant denied that it entered into the consideration of this agreement, that the plaintiff should not be sued for the purchase money. Other declarations of the plaintiff that he had no claim to the premises, were stated in the answer, and all the facts stated in the answer were proved. The chancellor says, "I have considered this case with great attention, and I cannot discover any just principle arising out of the facts, that will warrant a decree for a specific performance. The bill is founded on an agreement of 28th March 1810, signed by the defendant only, and by which he agreed to sell the plaintiff the land in question, upon the following conditions being performed at the times stipulated, to wit: (as above stated) under this agreement, the plaintiff entered into possession and made improvements, but he made no payments; and in October 1813, (which was about two years after the first default) the defendant considering the agreement as void or abandoned, sold the land to another person; and in February 1814, the plaintiff filed his bill for a specific performance. I need not stay to see how far the

JUNE TERM
1836.

Russell
v.
Geyer and others.

want of mutuality is applicable to this contract, since the decision can be placed with more satisfaction upon the intrinsic merits of the case. But the point being stated by the counsel, I am unwilling to pass it by without observing that it has been ruled in several cases, that a bill for a specific performance, will not be sustained if the remedy be not mutual, or where one party only, is bound by the agreement. There was an express stipulation in this contract, that if the plaintiff failed in either of his payments, the agreement was to be void. The first question that naturally presents itself is, whether the time was not here made part of the essence of the contract, and whether the contract did not become void on the failure of the plaintiff to make the first payment in 1811. Lord Thurlow is said to have intimated in Gregson v. Riddle, (cited in 7th Vesey, 268) that time could not be made of the essence of the contract even by a positive stipulation of the parties; but there was no decision on this point. And in other and later cases, it has been admitted that the parties may make the time of the essence of the agreement, so that if there be a default at the day without any just excuse, and without any waiver afterwards, the court will not interfere to help the party in default. The case is not analogous to that of a mortgage, where the only object of the security is the payment of the money; and not the transfer of the estate. And it seems to be conducive to the preservation of good faith, and the rights of the parties, that if the contract of the sale, is expressly declared to be vacated on non performance by a given day, that the courts should not interfere as of course, to annul such a provision. The opinion of Lord Loughborough, in Loyd v. Collet, contains a strong and decisive argument upon this point. There is nothing, he observes, of more importance than, that the ordinary contracts between man and man, which are so necessary in their intercourse with each other, should be certain and fixed; and that it should be certainly known when a man is bound, and when not. There is a difficulty to comprehend how the essentials of a contract should be different in equity and at law. It is one thing to say that time is so essential, that in no case in which the day has been by any means suffered to elapse, the court would relieve against it, and decree performance. The conduct of the parties, inevitable accident &c. might induce the court to relieve. But it is a different thing to say the appointment of a day is to have no effect at all: and that it is not in the power of the parties to contract, that if the

JUNE TERM
1836.

Russell
v.
Geyer and others.

agreement is not executed at a particular time, they shall be at liberty to rescind it. In most of the cases there have been steps taken. I want a case, he says, to prove that where nothing has been done by the parties, this court will hold in a contract of buying and selling a rule, that time is not an essential part of the contract. Here no step had been taken from the day of the sale for six months after the expiration of the time at which the contract was to be completed. If a given default will not do, what length of time will do? An equity arising out of one's own neglect! it is a singular head of equity."

It would be impossible for one, resumes chancellor Kent, to add to the perspicuity and energy of this reasoning; and the Lord chancellor in that case, held, that as the vendor had omitted to complete a purchase for six months, being all that time in default, he was considered as having abandoned the contract; and he said there was no case where no step had been taken by the one party, and the other had immediately when the time had elapsed, refused to perform the agreement, that a performance had been decreed.

It may then be laid down as an acknowledged rule in the courts of equity (and so the rule is considered in the elementary treatises on this subject—Newland on contracts, 242—Sugden L. of vendors, 3rd London edition 268,) that where the party who applies for a specific performance has omitted to perform his part of the contract by the time appointed for that purpose, without being able to assign any sufficient justification or excuse for his delay: and when there is nothing in the acts or conduct of the other party, that amounts to an acquiescence in that delay, the court will not compel a specific performance. This rule appears to me to be founded in the soundest principles of policy and justice: its tendency is to uphold good faith and punctuality in dealing. The notion which seems too much to prevail (and of which the facts in the present case furnish an example,) that a party may be utterly regardless of his stipulated payments, and that a court of chancery will almost at any time, relieve him from the penalty of his gross negligence, is very injurious to good morals, to a lively sense of obligation, to the sanctity of contracts, and to the character of this court. It would be against all my impressions of the principles of equity, to help those who show no equitable title to relief. According to the rule then laid down by chancellor Kent, and so admirably vindicated, even Geyer himself, if he has not paid the money to Lindell, cannot

now enforce a specific performance of the contract to convey. What relief then can the complainant expect, who so far from offering to pay Lindell the purchase money and rent, chooses to rest the merits of his claim upon frauds imagined by himself, but of which the testimony produced by him, furnishes the court no evidence? had the complainant availed himself of the offer which the imprudent good nature of one of the defendants induced him to make to Geyer and his creditors, at and immediately after the sale by the sheriff, or had he before any default was made by Geyer in his payments to Ferguson first and next to Collier, applied to a court of chancery, tendering all the money due, little doubt can be entertained that such court would have substituted him to Geyer, so far as to have his mortgage satisfied out of the property, if that had been sufficient. But from some of the testimony given, there is little room left to believe that the complainant would have gained much by the interposition of a court of chancery in this way; and he has chosen to rest his claim on the alleged fraudulent conduct of the defendants.

Many of the arguments urged in this case have not been noticed in this opinion, on account of its great length, and a belief that the law was so well settled in this country that no notice was necessary. Such for instance, as that an attorney for the plaintiff in an execution, cannot bid off property for his client, but will be considered as holding it in trust for both parties in the execution; and the very cases cited to sustain the position show the error. A solicitor to the assignees of a bankrupt, is virtually counsel both for the bankrupt and his creditors: for he is counsel for the assignees who hold the property in trust. And in the case of Howell v. Baker, above cited from 4th Johnson's ch. Rep. chancellor Kent expressly recognises the attorney as the agent of the plaintiff, and the defendant Baker had at the sheriff's sale, where he was attorney to the execution declared himself buying in the property for Howell the defendant. The chancellor, passing on from the consideration of the case of a solicitor of the assignees of a bankrupt, with the impression made by the evidence of the particular case on his mind, might well have, used the ambiguous words on which the counsel for the complainant in this case rely; although quite a different inference is to be drawn from his positive declaration in the preceding part of the opinion, that the attorney is the agent of the plaintiff, has the control of the execution &c. It can

53

hardly be supposed that any body, but such as are prejudiced by their interests, ever supposed that it was not the right, and sometimes even the duty of the attorney in Missouri, where the place, time and manner of selling, are not under his control, to attend the sale and bid for the property, 'till it brings the amount required to be raised. The argument that the sheriffs have no right to sell on execution to make their fees, is equally novel, and of as little weight, since if it were true, the sale under the execution would not on that account be void, when the execution had been issued to collect the debt as well as costs.

For the reasons above given, it seems the decree of the circuit court, dismissing the complainant's bill, ought not to be reversed. It is therefore affirmed, and the appellees are allowed their costs as well in the circuit court as in this court.